**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON**

**CIVIL ACTION NO. 25-180-DLB**

**JAMILA ISSAHAKU**                                                               **PETITIONER**

**v.**                       **MEMORANDUM OPINION AND ORDER**

**SAMUEL OLSON, et al.,**                                      **RESPONDENTS**

\* \* \* \* \* \* \* \* \* \*

**I.   INTRODUCTION**

This matter is before the Court on Petitioner Jamila Issahaku's Petition for Writ of Habeas Corpus (Doc. # 1). Respondents[1] having filed their Responses (Docs. # 6 and 7), and Petitioner having filed her Reply (Doc. # 8), this matter is now ripe for review. For the reasons that follow, the Court will **grant** the Petition.

**II.   FACTUAL AND PROCEDURAL BACKGROUND**

Petitioner Jamila Issahaku is a citizen of Ghana who has resided in the United States since approximately April 26, 2024. (Doc. # 1 ¶ 15). Petitioner was almost immediately apprehended by border control but was released on her own recognizance on April 27, 2024. (Doc. # 1-6). Petitioner was also placed in removal proceedings by

---

[1] Petitioner files this action against Samuel Olson, Acting Field Office Director of Enforcement and Removal Operations ("ERO"), Chicago Field Office, Immigration and Customs Enforcement ("ICE"); Kristi Noem, Secretary, U.S. Department of Homeland Security ("DHS"); Pamela Bondi, U.S. Attorney General; and Todd M. Lyons, Acting Director, US ICE, in his official capacity (collectively, "Respondents"). Petitioner additionally filed this action against James A. Daley, Jailer, Campbell County Detention Center. Respondent Daley filed his Response, arguing that he is not Petitioner's legal or immediate custodian. (Doc. # 6). This is not disputed by Petitioner, and therefore, the Court will address only the Response filed by the other listed Respondents. (*See* Doc. # 7).

1

DHS before the Chicago Immigration Court where she was ordered to appear before an Immigration Judge ("IJ") on October 29, 2024. (Doc. # 1-4). On February 27, 2025, Petitioner filed for asylum. (Doc. # 1-5). Her Master Hearing before an IJ is set for May 22, 2026. (*Id.*). On October 27, 2025, Petitioner was arrested by DHS when she appeared for a routine check in. (Doc. # 1 ¶ 23). The issued warrant was not properly filled out. (*See* Doc. # 1-2). First, the warrant listed Petitioner's name as "Jamila Aku" instead of "Jamila Issahaku." (*Id.*). Second, the warrant did not indicate the basis for Petitioner's arrest, as all the boxes were left blank. (*Id.*). Petitioner additionally claims that "DHS filed with the immigration court a false I-830, Notice to [Executive Officer for Immigration Review ("EOIR")]: Alien Address, claiming that Petitioner was moved to the Clark County Jail in Indiana, when in fact she was still at the Broadview ICE Facility in Broadview, Illinois." (Doc. # 1 ¶ 2). Petitioner states that she "remained at Brondview [sic], without access to counsel, for four days, until she was moved to the Campbell County Detention Center." (*Id.*).

On November 5, 2025, Petitioner, through counsel, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 (Doc. # 1). Petitioner claims that she is being improperly detained at the Campbell County Detention Center in Newport, Kentucky. (*Id*. ¶ 1). Among other things, Petitioner requests that this Court order her immediate release. (*Id*. at 21). On November 14, 2025, this Court directed Respondents to respond to Petitioner's pleading. (Doc. # 5). With Respondents having filed their Responses (Docs. # 6 and 7), and Petitioner having filed her Reply (Doc. # 8) this matter is now ripe for the Court's review.

### III. ANALYSIS

Issahaku's Petition alleges violations of the Immigration and Nationality Act ("INA") and the Fifth Amendment's Due Process Clause. (Doc. # 1 ¶¶ 72-79). Petitioner argues that as a non-citizen residing in the United States at the time of her apprehension, she is subject to the discretionary detention provisions in 8 U.S.C. § 1226(a). (*Id.*). Respondents disagree, asserting that 8 U.S.C. § 1225(b)(2)(A) is the applicable statute, which would mandate detention. (Doc. # 7 at 6). Petitioner seeks immediate release from custody, or, in the alternative, a bond hearing; and asks this Court to declare that 8 U.S.C. § 1226(a)—and not 8 U.S.C. § 1225(b)(2)(A)—is the appropriate statutory provision. (Doc. # 1 at 21).

#### A. Relevant Framework

At its core, habeas is "a remedy for unlawful executive detention" *Munaf v. Geren*, 553 U.S. 674, 693 (2008), granted to "every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). The "typical remedy for such detention is, of course, release." *Munaf*, 553 U.S. at 693. Such relief "may be granted by the . . . district courts . . . within their respective jurisdictions." 28 U.S.C. 2241(a). The Supreme Court has recognized that habeas relief extends to noncitizens. *See Rasul v. Bush*, 542 U.S. 466, 483 (2004) ("[Alien] Petitioners contend that they are being held in federal custody in violation of the laws of the United States . . . Section 2241, by its terms, requires nothing more."). Enacted in 1952, the INA consolidated previous immigration and nationality laws, now containing "many of the most important provisions of immigration law." U.S. Citizenship and Immigration Services, *Immigration and Nationality Act* (July 10, 2019), https://www.uscis.gov/laws-and-policy/legislation/immigration-and-nationality-

act#:~:text=The%20Immigration%20and%20Nationality%20Act,the%20U.S.%20House%20of%20Representatives. Specifically, Congress established two statutes, codified in Title 8, which govern detention of noncitizens pending removal proceedings—8 U.S.C. §§ 1225 and 1226.

The first statute, 8 U.S.C. § 1225 titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing" states, in pertinent part,

> **(b)  Inspection of applicants for admission**
>
> **(2)  Inspection of other aliens**
>
> **(A)  In general**
>
> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229(a) of this title.

8 U.S.C. § 1225(b)(2)(A). Important to note, for purposes of this provision, "an alien who is an applicant for admission" is defined as an "alien present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1).

The second provision at issue, 8 U.S.C. § 1226, titled "Apprehension and detention of aliens" reads

> **(a) Arrest, detention, and release**
>
> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—
>
> (1)  May continue to detain the arrested alien; and
>
> (2)  May release the alien on—

4

> (A)    Bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General . . . .

8 U.S.C. § 1226(a).

Section 1226(c) of the INA was amended by Congress in January 2025 with the enactment of the Laken Riley Act, which added a new subsection under Section 1226(c) which requires certain mandatory detentions. Pub. L. No. 119-1, § 2, 139 Stat. 3, 3 (2025). The amendment added a two-step process, in which the Attorney General must detain a noncitizen if

> (1) they are inadmissible because they are in the United States without being admitted or paroled, obtained documents or admission through misrepresentation or fraud, or lacks valid documentation and
>
> (2) is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person.

*Barrera v. Tindall*, No. 3:25-cv-541-RGJ, 2025 WL 2690565, at *3 (W.D. Ky. Sep. 19, 2025) (quoting U.S.C. §§ 1226(c)(1)(E)(i)-(ii)).

The distinction between 8 U.S.C. §§ 1225 and 1226 is relevant to Issahaku's Petition. Pursuant to 8 U.S.C. § 1226(a), noncitizens who are arrested and detained have the right to request a bond hearing before an IJ. Conversely, under 8 U.S.C. § 1225(b)(2)(A), all aliens deemed to be applicants for admission *must* be detained. As noted *supra*, Petitioner, a noncitizen who has lived in the United States for nearly 2 years, has now been detained by ICE and is being held at the Campbell County Detention

5

Center.  The question, then, is whether Petitioner must be detained under § 1225, or whether she has the right to request a bond hearing pursuant to § 1226.[2]

### B. Statutory Interpretation

With the parties disagreeing about which statute applies to Petitioner's detention, the issue before the Court is clearly one of statutory interpretation.  In interpreting statutes, district courts must "use every tool at their disposal to determine the best reading of the statute." *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 400 (2024).  Statutes must be given their "ordinary, contemporary, common meaning" *Walters v. Metro Edu. Enters., Inc.*, 519 U.S. 202, 207 (1997), while also being read "in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012).

The Court first turns to the plain language of the statute.  The Court begins by looking at the first words one may read—the title.  A "[c]ourt gives each and every word meaning, and this includes the title." *Barrera*, 2025 WL 2690565, at *4.  While section headings are not dispositive, "they are instructive and provide the Court with the necessary assurance that it is at least applying the right part of the statute in a given circumstance." *Lopez-Campos v. Raycraft*, No. 2:25-cv-12486, 2025 WL 2496379, at *8 (E.D. Mich. Aug. 29, 2025); *see also id*. ("This Court has long considered that the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (quoting in a parenthetical *Dubin v. United States*, 599

---

[2] The Court notes that the matter before this Court is *not* whether the executive branch has the authority to direct ICE/DHS to detain and deport noncitizens.  The question before the Court is whether those noncitizens—specifically Petitioner Issahaku—are entitled to request a bond hearing before an IJ prior to their removal hearing pursuant to 8 U.S.C. § 1226(a) or must be mandatorily detained pursuant to 8 U.S.C. § 1125(b)(2)(A).

6

U.S. 110, 120-21 (2023))).  Section 1225 is titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for a hearing[.]"  Section 1226 is titled "apprehension and detention of aliens" with a focus on "arrest, detention, and release[.]"  Thus, the text of the titles indicate that § 1225 governs "arriving" noncitizens who are *presently* "seeking admission" into the United States,[3] while § 1226 focuses on the apprehension and detention of those noncitizens already in the country.  *See Edahi v. Lewis*, No. 4:25-cv-129-RGJ, 2025 WL 3466682, at *7 (W.D. Ky. Nov. 27, 2025) ("The added word of 'arriving' supports the notion that the statute governs 'arriving' noncitizens, not those present already.").

Section 1225(a)(1) states that an "applicant for admission" is "an alien present in the United States who has not been admitted or who arrives in the United States."  Under § 1225(b)(2)(A) any applicant for admission who is "seeking admission" and "is not clearly and beyond a doubt entitled to be admitted" must be detained.  The analysis then, is twofold.  For a noncitizen to be mandatorily detained under § 1225(b)(2)(A), they must be an applicant for admission who is seeking admission.  As other district courts have acknowledged, "[h]ow can an 'applicant for admission' not 'seek admission?'"  *J.G.O. v. Francis*, No. 25-cv-7233, 2025 WL 3040142, at *3 (S.D.N.Y. Oct. 28, 2025).  Such an oddity is explained by looking towards the statutory definition.  To be an applicant for admission, "[a]ll that's needed is presence without admission—in other words, it applies to the great number of undocumented immigrants who currently live here."  *Id*.  By

---

[3]   This is supported by the text of § 1225, which focuses on limited and specific methods of entry, for example, via "crewman" or "stowaways," leading to the conclusion that "Section 1225 is much more limited in scope than the United States asserts."  *Barrera*, 2025 WL 2690565, at *4.

contrast, seeking admission "might mean something more than that—some active desire or process toward admission." *Id*.

Respondents do not agree with this reading. Rather, they take the position that for a noncitizen to qualify as an "applicant for admission" who is "seeking admission" one must merely be (1) present in the United States, and (2) not be admitted by an immigration officer. (Doc. # 7 at 8). Thus, Respondents contend that, despite Petitioner residing in the United States for nearly two years, she is still "seeking admission" because any noncitizen who is "[s]imply . . . in the United States without having been admitted . . . is actively seeking admission into the United States." (*Id*. at 10). Respondents' interpretation of § 1225(b)(2)(A), therefore, would call for mandatory detention of *every* noncitizen present in the United States who has not been lawfully admitted. The Court finds this interpretation much too broad. *See Maldonado v. Olson*, No. 25-cv-3142, 2025 WL 2374411, at *12 (D. Minn. Aug. 15, 2025) ("[A]ccepting Respondents' one-size-fits-all application of 1225(b)(2) to all aliens, with no distinctions, would violate fundamental canons of statutory construction.").

In coming to their conclusion, Respondents misconstrue, or ignore entirely, the word "seeking" in the phrase "seeking admission." Respondents argue that a noncitizen who is merely present in the United States is "actively seeking admission." (Doc. # 7 at 10). The use of the present progressive term "seeking" "implies action." *Barrera*, 2025 WL 2690565 at *4; *see also Diaz v. Marinez,* 792 F. Supp. 3d. 211, 218 (D. Mass. 2025) ("[T]he phrase 'seeking admission[,]' [though] undefined in the statute[,] [] necessarily implies some sort of present-tense action."); *Edahi*, 2025 WL 3466682 at *8 ("Seeking means 'to go in search of' and is synonymous with 'pursue.'" (quoting Webster's

8

Dictionary (11th ed. 2024))). Furthermore, the INA defines the term "admission" as "the lawful *entry* of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A) (emphasis added). Given that the word "entry" is left undefined by the INA, courts interpret it according to its "ordinary, contemporary, common meaning." *Star Athletica, LLC v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) (internal quotations omitted). "That meaning is 'entering into . . . (a country),' which is '[t]o come or go in.'" *J.G.O.*, 2025 WL 3040142, at *3 (quoting *Entry*, OXFORD ENGLISH DICTIONARY (2d ed. 1989); *Enter*, OXFORD ENGLISH DICTIONARY (2d ed. 1989)). Thus, it cannot be said that Petitioner, a noncitizen who was residing here for nearly two years was "actively seeking admission." *See id.* ("'[S]eeking admission' requires an alien to continue to want to go into the country. The problem . . . is that [the petitioner] is already here; you can't go into a place where you already are."). Numerous district courts have come to the same conclusion. *See Barrera*, 2025 WL 2690565, at *4 ("Noncitizens who are present in the country for years, like [petitioner] who has been here 20 years, are not actively 'seeking admission.'"); *Lopez-Campos*, 2025 WL 2496379, at *7 ("There is no logical interpretation that would find that Lopez-Campos was actively 'seeking admission' after having resided here, albeit unlawfully, for twenty-six years."); *Ochoa Ochoa v. Noem*, No. 25-cv-10865, 2025 WL 2938779, at *6 (N.D. Ill. Oct. 16, 2025) ("In agreement with other district courts, this court rejects Respondents' expanded reading of 1225(b)(2) and the term "seeking admission."). Moreover, to adopt Respondents' interpretation of the verb "seeking" would render the phrase "seeking admission" "mere surplusage by equating it to 'applicant for admission.'" *Ochoa Ochoa*, 2025 WL 2938779, at *6; *see also J.G.O.*, 2025 WL 3040142, at *3 ("[T]his

9

is just another example of the government's construction inviting surplusage into the statute. That Congress chose to include this additional phrase—'seeking admission' . . . suggests that it must mean something distinct."). The Court declines to adopt such an expansive reading of § 1225(b)(2)(A).[4]

Neither party contends that Petitioner's pending asylum application impacts whether she is "seeking admission" under § 1225(b)(2)(A). Even if they had, that fact is not dispositive because she did not "apply for asylum when she was '*arriving*' to the United States, as the statute would require." *Edahi*, 2025 WL 3466682, at *8 (emphasis added). Rather, Petitioner filed for asylum January of this year, nearly a year after she had been released on her own recognizance. (*See* Doc. # 1-5). Petitioner at present, and at the time she filed for asylum, was no longer being inspected. As such, "[t]here is simply no logical way to interpret [Petitioner] as 'arriving[.]'" *Edahi*, 2025 WL 3466682, at *8; *see also Santos Francos v. Raycraft*, No. 2:25-cv-13188, 2025 WL 2977118, at *7 (E.D. Mich. Oct. 21, 2025) ("And even if Respondent argues that [the petitioner] is 'seeking admission' because he applied for asylum . . . that was not done when he was 'arriving' to [the United States]. So the applicability of § 1225(b)(2)(A) would still be incorrect."); *Benitez v. Francis*, 795 F. Supp. 3d. 475, 488 fn. 7 (S.D.N.Y. Aug. 13, 2025) ("To the extent that Respondents might point to [the petitioner's] asylum application to argue that he continues to 'seek' something, what he seeks is not 'admission' or 'lawful entry' to the United States, but to obtain a lawful means to *remain* here."); *Navarrete v. Noem*, No. 4:25-cv-157-DJH, 2025 WL 3298081, at *2 (W.D. Ky. Nov. 26, 2025) ("The fact that [the

---

[4] The Court notes that in their Response, Respondents repeatedly reference *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 220-21 (BIA 2025), an opinion from the Board of Immigration Appeals. Pursuant to the recent Supreme Court decision in *Loper Bright*, courts "need not defer to any agency interpretation of law just because a statute is ambiguous." 603 U.S. at 412-413.

10

petitioner] sought asylum almost a year after entering the United States [] does not render § 1225(b)(2) applicable because she did not apply at the border.")

The Court now turns to the plain language of § 1226, which controls the "apprehension and detention of aliens." Section 1226(a) permits a bond hearing if an "alien" who was "arrested and detained" on a "warrant issued by the Attorney General" is "pending a decision on whether the alien is to be removed from the United States." The plain meaning of the statute is clear and applicable to Petitioner—an alien, who was arrested and detained by ICE, and is currently pending removal proceedings. (Doc. # 1 ¶ 24). This is further bolstered by the record. The Notice to Appear, issued by DHS, checked the box labeled "You are an alien *present* in the United States who has not been admitted or paroled" rather than checking the box labeled "*arriving* alien." (Doc. # 1-4 at 1) (emphasis added). This supports this Court's conclusion and reaffirms the Supreme Court's determination in *Jennings v. Rodriguez,* that § 1226(a) applies to aliens already present in the United States, while § 1225(b)(2)(A) applies to arriving aliens. 583 U.S. 281, 298, 303 (2018). The Respondents' new post hoc position is simply "impermissible." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020) (holding that "[t]he basic rule is clear: [a]n agency must defend its actions based on the reasons it gave when it acted," not on "impermissible post hoc rationalizations").

Most compelling for this Court is the addition of the Laken Riley Act, signed into law in January 2025. The Laken Riley Act, which was incorporated into § 1226(c), provides that noncitizens who have been charged with, convicted of, or admitted to committing various listed crimes, are subject to mandatory detention. 8 U.S.C. § 1226(c). If, as Respondents argue, Congress had intended for § 1225 to govern all noncitizens

11

who are present in the country, regardless of when or where they were detained, then why did Congress even bother passing that legislation. The addition of the Laken Riley Act would be superfluous. The Laken Riley Act added a mandatory detention requirement, "in an otherwise discretionary Section." *Barrera*, 2025 WL 2690565, at *4. As other courts have noted,

> [i]f § 1225(b)(2) already mandated detention of any alien who has not been admitted, regardless of how long they have been here, then adding § 1226(c)(1)(E) to the statutory scheme was pointless and this Court, too, 'will not find that Congress passed the Laken Riley Act to 'perform the same work' that was already covered by § 1225(b)(2).

*Lopez-Campos*, 2025 WL 2496379, at *8 (quoting *Maldonado*, 2025 WL 237441, at *12); *see also id*. ("Respondents' interpretation of the statutes would render [the Laken Riley Act] superfluous); *Marinez*, 792 F. Supp. 3d. at 221 ("[I]f, as the Government argue[s] ... a non-citizen's inadmissibility were alone already sufficient to mandate detention under section 1225(b)(2)(A), then the 2025 amendment would have no effect. This is a presumptively dubious result."); *Selvin Adonay E.M. v. Noem et al*, No. 25-cv-3975, 2025 WL 3157839, at *6 (D. Minn. Nov. 12, 2025) ("the presumption against superfluity is at its strongest because the Court is interpreting two parts of the same statutory scheme, and Congress even amended the statutory scheme this year when it passed the Laken Riley Act.").

This Court agrees with its sister courts. Respondents fail to elaborate when, if § 1225(b)(2) applies to *every single* noncitizen's detention proceeding, § 1226 would ever, if at all, come into play.[5] The Court finds it difficult to conceive of a situation in which

---

[5] Respondents make various public policy arguments on why noncitizens who have entered the country without detection should not be treated more favorably than those who "entered lawfully." (Doc. # 7 at 14). While valid arguments, the text, as clearly indicated above, "does not currently reflect such public policy considerations." *Maldonado*, 2025 WL 2374411, at *12.

Congress would enact an insignificant superfluous statute for no other reason than to add words to the page.  *See Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

The Court acknowledges that the United States cites a string of nonbinding district court decisions supporting their interpretation.  For example, the United States cites to *Meija Olalde v. Noem et al.*, a case from the Eastern District of Missouri.  There, the court agreed with the government's interpretation of § 1225(b)(2)(A), concluding that the petitioner was an applicant for admission because he was present in the United States and had not been admitted.  No. 1:25-cv-00168-JMD, 2025 WL 3131942, at *1 (E.D. Mo. Nov. 10, 2025).  In its analysis, the court looked not towards whether the petitioner was "seeking admission" but whether he was an "applicant for admission."  *Id*. at *2.  Its reasoning rested in part on the conclusion that it "makes no sense to describe an active applicant for admission as somebody who is not 'seeking' admission."  *Id*. at *3. Yet, as the Court discussed above, "to be detained pursuant to Section 1225(b)(2)(A), that is *precisely* what the text requires."  *Edahi*, 2025 WL 3466682, at *12.  "Holding as *Olalde* does would require the Court to ignore the plain statutory text.  But Courts must give effect to every word in the statute. . . In ignoring the very words of section 1225(b)(2)(A) *Olalde* defies this principle."  *Id*.

Respondents also cite *Rojas v. Olson*, No. 25-cv-1437-bhl, 2025 WL 3033967 (E.D. Wis. Oct. 30, 2025) and *Sandoval v. Acuna*, No. 6:25-cv-01467, 2025 WL 3048926

---

"Rather, such arguments may be made to Congress if Respondents would like to amend or repeal § 1225 or § 1226, but such policy arguments are not reflected in the Laken Riley Act amendment … passed only a few months ago."  *Id*.

13

(W.D. La. Oct. 31, 2025).  (Doc. # 7 at 9).  However, the Court is not persuaded by either of these decisions.  Specifically, the Court is unconvinced because both *Rojas* and *Sandoval* did not conclude that the recent addition of the Laken Riley Act would be rendered superfluous if § 1225(b)(2)(A) required mandatory detention of all noncitizens. *See Rojas*, 2025 WL 3033967, at *9 ("[L]egislation passed in 2025 has little bearing on the meaning of legislation enacted in 1996.  Indeed, nothing in the Laken Riley Act suggests any Congressional thoughts concerning the issues presented in this case."); *Sandoval*, 2025 WL 3048926, at *5 ("The statutory scheme of the INA does not render these two provisions mutually exclusive, and there are many other categories of aliens to whom § 1226(a) is applicable, but not § 1225(b)(2).").  This Court, and many others, disagree with that interpretation.  *See Edahi*, 2025 WL 3466682, at *11 ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect. . . *Rojas*' reading of the Laken Riley Act underscores this very premise.") (internal quotations omitted); *id.* at 11 ("Reading the statute as *Sandoval* does, would therefore have 'two separate clauses' preforming the 'same work.'" (quoting *United States v. Taylor*, 596 U.S. 845, 857 (2022))).[6]

Finally, pertinent legislative history reinforces the Court's conclusion.  *See Loper Bright,* 603 U.S. at 386 ("[T]he longstanding practice of the Government—like any other interpretive aid—can inform [a court's] determination of what the law is.").  Enacted in 1952, the INA "distinguished between aliens physically arriving in the United States and

---

[6]   The Court notes that in addition to *Olalde*, *Rojas*, and *Sandoval*, Respondents cite to numerous other cases that support their interpretation.  (*See* Doc. # 7 at 9).  The Court declines to go into a detailed analysis of why it disagrees with each and every case Respondents cite.  For all the reasons stated above, the Court disagrees with Respondents' interpretation, and the conclusion of those various district courts, that § 1225(b)(2)(A) is the applicable statute in this case.

14

those who had entered the Country." Library of Congress, *Immigration Detention: A Legal Overview* (Sep. 16, 2019), https://www.congress.gov/crs-product/R45915#_Ref17891326. In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") which focused on whether the noncitizen "had been lawfully admitted into the country by immigration authorities." *Id*. Since the IIRIRA's enactment "the statutory framework governing detention has largely remained constant." *Id*. In applying the INA to detention proceedings, the Government has, for the past thirty years, consistently applied § 1226(a). It was not until July of 2025 when DHS/ICE announced a new policy, titled "Interim Guidance Regarding Detention Authority for Applicants for Admission" where it deemed all persons who entered the United States without inspection "applicants for admission" under § 1225, that the Government changed course. U.S. Customs and Border Protection, *Detention of Applicants for Admission*, (Sep. 18, 2025) https://www.cbp.gov/document/foia-record/detention-applicants-admission; *see also Lopez-Campos,* WL 2496379 at *5 ("For the past 30 years, the Government has applied Section 1226(a)[.]" It is only "now that . . . they want the Court to declare that the application of Section 1226(a) is incorrect."). This sudden change contradicted the long-established understanding that § 1225(b) "applies primarily to aliens seeking entry into the United States" while § 1226(a) "applies to aliens already present in the United States." *Jennings*, 583 U.S. at 298, 303; *see also id*. at 288 ("Section 1226(a) sets out the default rule for those aliens [already present in the United States.]"). Therefore, the legislative history reflects a longstanding practice of applying § 1226(a) to noncitizens already residing in the country.

15

"The plain language of the statutes, the overall structure, the intent of Congress, and over 30 years of agency action make clear that Section 1226(a) is the appropriate statutory framework … for noncitizens who are already in the country and facing removal." *Lopez-Campos*, 2025 WL 2496397, at *5.  Therefore, the Court finds that Issahaku is not subject to § 1225(b)(2)(A).  Rather, the facts of the case make clear that she falls under § 1226(a).  Accordingly, her Petition requesting bond, or in the alternative, a hearing, is **granted**.

### C.  Due Process

Because the Court has concluded that § 1226(a) is the appropriate statutory framework to apply to Petitioner, the Court must now determine whether her current detention violates her due process rights.  Respondents did not address this issue in their Response.

The Fifth Amendment states, in pertinent part, that no person shall be "deprived of life, liberty, or property, without due process of law[.]"  U.S. Const. Amend. V.  The Supreme Court has repeatedly held that the Due Process Clause extends to all persons, regardless of citizenship status.  *See A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) ("[T]he Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." (quoting *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025))).  To determine whether a detainee's due process rights have been violated, courts apply a three-part balancing test:

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the United States' interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 321 (1976).

It is undisputed that Petitioner has a cognizable private interest in avoiding detention without an opportunity for a bond hearing. *See Hamdi*, 542 U.S. at 531 (affirming "the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law[.]"). Second, the risk of erroneous deprivation of that interest is high if she is not afforded a detention hearing. As to the third factor, Respondents have not put forth any argument whatsoever advocating for the United States' interest. The Court, on its own, concludes that the United States likely has a strong interest in immigration proceedings, but certainly, the "existing statutory and regulatory safeguards" which this Court discussed at length about above, "serve the governmental interest in public safety." *Barrera*, 2025 WL 2690565, at *7 (quoting *Günaydin v. Trump*, No. 25-cv-01151, 2025 WL 1459154, at *10 (D. Minn. May 21, 2025)). Accordingly, all three factors weigh in favor of Petitioner. As other courts have concluded, Petitioner's detention without a bond hearing violates the due process rights afforded to her by the Fifth Amendment and she is therefore entitled to an individualized custody determination.

## IV.   CONCLUSION

Accordingly, for the reasons set forth herein, **IT IS ORDERED** as follows:

(1)   Petitioner's Petition for Writ of Habeas Corpus (Doc. # 1) is **GRANTED**;

(2)   Respondents are **ORDERED** to **immediately release** Petitioner, or in the alternative, provide her with a **bond hearing** under 8 U.S.C. 1226(a) **within seven (7) days of the date of this order**; and

(3)  Respondents shall file a Status Report with this Court **on or before December 17, 2025**, to certify compliance with this Order. The Status Report shall include when the bond hearing occurred, if bond was granted or denied, and if denied, the reasons for that denial.

This 10th day of December, 2025.



Signed By:
*David L. Bunning*
Chief United States District Judge

G:\Judge-DLB\DATA\ORDERS\Cov2025\25-180 - Order granting writ.docx